UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 SEP 29  PM 4: 47

CLERK

BY_____
DEPUTY CLERK

LORRAINE BETTIS and ROBIN POWERS,  )
Administrators, Estate of Wesley Bettis,  )
                                           )
       Plaintiffs,  )
                                           )
      v.  )    Case No. 5:14-cv-113
                                         )
CHAD BEAN,  )
                                         )
       Defendant.  )

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION
FOR SUMMARY JUDGMENT**
(Docs. 32 & 39)

Plaintiffs Lorraine Bettis[1] and Robin Powers, Administrators of the Estate of

Wesley Bettis (hereafter "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983

against Defendant Officer Chad Bean.  They allege Officer Bean violated Wesley Bettis's

Fourth Amendment rights by applying excessive force when he arrested Mr. Bettis in the

course of a domestic disturbance.  Plaintiffs seek damages for pain and suffering under

Vermont's wrongful death and survivorship statutes, 14 V.S.A. §§ 1491, 1492.

Pending before the court is Plaintiffs' motion for partial summary judgment (Doc.

32) and Officer Bean's cross motion for summary judgment (Doc. 39).  Plaintiffs seek

partial summary judgment in their favor on the issue of excessive force.  Officer Bean

cross moves for summary judgment in his favor on Plaintiffs' excessive force claim, or,

in the alternative, asks the court to find he is entitled to qualified immunity with regard to

all of Plaintiffs' claims.  On August 24, 2015, the court took the pending motions under

advisement.

Plaintiffs are represented by David J. Williams, Esq. and Brooks G. McArthur,

Esq.  Officer Bean is represented by Nancy G. Sheahan, Esq.

---

[1] Plaintiff Lorraine Bettis has remarried and changed her name to Lorraine Perreault.

## I.    The Undisputed Facts.

### A.    The Domestic Disturbance.

Plaintiffs' claims arise out of a domestic disturbance on June 26, 2012 at the Bettis residence in Montpelier, Vermont between Wesley Bettis and his wife.  At the time, Mr. Bettis suffered from a bleeding disorder due to removal of his spleen in 1983, dementia, and Parkinson's disease.  He also had rotator cuff and joint issues that made it difficult for him to lift his arms up parallel to the floor and then up over his head or up in front of him.  However, during the only range of motion testing performed on his left shoulder, he could reach to the small of his back with reasonable strength and function.  In 2005, Mr. Bettis had also been treated for problems with both of his shoulders.  Defendant Officer Bean[2] had no prior contact with Mr. Bettis and was unaware of his medical conditions or mental health issues before the incident in question.

The incident began with a dispute over Mr. Bettis's request for additional antacids which Ms. Bettis refused to provide to him.  In response, Mr. Bettis knocked the container of antacids out of her hand and they spilled on the floor.  Ms. Bettis escorted him into the master bedroom of their home.  Mr. Bettis became very angry and grabbed Ms. Bettis by the wrists so that he was holding her right wrist with his left hand and her left wrist with his right hand.  Ms. Bettis was able to pull a phone lying on the bed over to her while Mr. Bettis was holding her wrists.  With the phone still on the bed, she was able to call 911.  Ms. Bettis had never previously called 911 to request police assistance.

Ms. Bettis's 911 call was recorded and the recording, which has not been altered, has been relied upon by both parties.[3]  After speaking with Ms. Bettis, who was crying,

---

[2] Officer Bean graduated from the Part-Time Vermont Police Academy in 2003 and the Full-Time Academy in 2004.  He has received training in the use of force, including training in a technique known as a rear wrist lock and in the proper use of oleoresin capsicum ("OC") spray, commonly known as pepper spray, which he is certified to use.

[3] "In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party." *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *7 (D. Vt. Nov. 28, 2012), *aff'd*, 548 F. App'x 6 (2d Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 379-81

the 911 operator contacted Capital West which is an emergency communications center located in the Montpelier Police Station. Capital West provides dispatching services to the Montpelier Police Department as well as dispatching services to a number of fire department and EMS services.[4]

During the 911 call, Mr. Bettis repeatedly told Ms. Bettis in a raised voice to hang up the phone. He also asked Ms. Bettis: "What's the matter with you, bitch?" (Doc. 32-4 at 3:19-25.)

While on the phone with the 911 operator, Capital West sent various dispatches to on-duty Montpelier police officers. An unaltered recording of those dispatches has also been relied upon by the parties. Initially, Capital West sent a dispatch asking if one or two officers "could slide up to 45 Pleasantview Street[.]" (Doc. 39-18 at 2:3-10.) The dispatch stated that an ambulance was "headed up there for an unknown 911 call" which was "was garbled, unintelligible" and that there was "somebody in the background saying they needed help." *Id.* The dispatch stated that it "[d]idn't sound like it was a fight, but they just sounded like someone was concerned." *Id.*

At the time of the first dispatch, Officer Bean and Montpelier Police Officer Kevin Moulton were patrolling in separate police cruisers. Montpelier Police Sergeant Wade Cochran was the sergeant in charge at the time and he was either on the road or going out on a call when the first dispatch was received. In a series of dispatches, Capital West provided the following additional information:

> 800-units, got an update on Pleasant View. It is sort of a domestic, maybe a mental health issue. Male in his sixties has his wife by the wrist. She is in pain. He's ordering her to get off the phone and she said he never acted like this before. He could be having some type of seizure.
>
>      ***
>
> He's yelling and swearing at her in the background.
>
>      ***

---

(2007)). There is no evidence that any of the police officers listened to the 911 recording before responding to the Bettis residence.

[4] Capital West uses different frequencies for police and fire/EMS services.

3

Still ongoing.

***

800-units. Unknown weapons. She's not holding the phone anymore so we can't ask her. They're still yelling in the background. She's in pain.

*Id.* at 5:2-7; 8:2-3; 11:3; 17:2-5.

Upon hearing the first dispatch, Officer Bean activated his cruiser lights and siren which triggered a video and audio recording from his cruiser as he proceeded to the Bettis residence. Officer Moulton and Sergeant Cochran also separately proceeded to that location. Two members of the Montpelier Fire and Ambulance Department, both of whom were Emergency Medical Technicians ("EMTs"), also responded. The police officers asked the EMTs to wait outside the Bettis residence and did not ask whether they knew Mr. Bettis or had any prior experience with him.[5] Officer Bean, Officer Moulton, and Sergeant Cochran have been trained that domestic dispute calls are among the most volatile and deadly for police officers and that arrest is the preferred response.

Sergeant Cochran approached the back of the Bettis residence where he could hear raised voices that sounded like a fight. Officer Moulton went to the door by the garage which was locked. He could hear screaming from inside the residence. Officer Bean proceeded to the front door of the Bettis residence and knocked on it and rang the doorbell without receiving a response. As he did so, he could hear yelling from inside the residence. Ms. Bettis heard the officers' knocking and told Mr. Bettis that she needed to go to the door. Mr. Bettis did not let her do so and continued to hold her by the wrists. Mr. Bettis was yelling at Ms. Bettis at a distance of approximately eighteen inches from her face and stated: "I don't care who's at the door" and "I'm not taking any more of your goddamn abuse." (Doc. 32-4 at 9:15-18.) When Officer Bean continued to hear yelling

---

[5] Prior to the date in question, the Montpelier Fire Department had been to the Bettis residence on at least four occasions, and the responding EMTs were aware of Mr. Bettis's deteriorating mental health. On prior occasions, Mr. Bettis opposed and actively resisted their requests that he go to the hospital.

from inside the residence, he announced "Montpelier Police" and kicked in the front door.[6]

Officer Bean was the first to enter the Bettis residence, followed by Officer Moulton and then Sergeant Cochran. The officers drew their firearms and made their way upstairs, announcing their presence as they did so. From his vantage point in the hallway, Officer Bean was able to see Mr. Bettis, who was considerably bigger than Ms. Bettis,[7] holding and squeezing Ms. Bettis's wrists and yelling at her. Ms. Bettis was visibly upset and was crying. Officer Bean again announced "Montpelier Police" and ordered Mr. Bettis to "[l]et her go." *Id.* at 10:1-3. Mr. Bettis did not comply with this command. Although the officers had no prior experience with Mr. Bettis, from his behavior they determined that his mental health was compromised. Mr. Bettis repeatedly stated: "I'm not taking it." *Id.* at 10:4-5. They also all believed that Mr. Bettis was hurting Ms. Bettis because he was yelling at her, holding her by her wrists, and she was crying.

As Mr. Bettis was in his underwear, the officers determined that he did not have a weapon on his person and so all three officers holstered their weapons. Officer Bean entered the bedroom first and instructed Mr. Bettis to "[g]et down." *Id.* at 10:6. Mr. Bettis did not comply with this order. Officer Bean then grabbed onto Mr. Bettis's left hand and pried his fingers from Ms. Bettis's right wrist. At approximately the same time, Officer Moulton attempted to pry Mr. Bettis's right hand away from Ms. Bettis's left wrist. Officer Moulton noted that he felt Mr. Bettis tense up and resist his attempts to remove his hand.

At that point, Officer Bean performed a rear wrist lock on Mr. Bettis's left hand, which he had been taught was a low-level force technique that uses pain compliance on a

---

[6] Plaintiffs' expert witness opines that it was reasonable for Officer Bean to force entry into the Bettis residence and to believe that unless there was some type of intervention, death or serious injury may occur.

[7] At the time of the incident, Mr. Bettis was a sixty-six year old male who was approximately 5'10" to 6' tall and weighed 200 to 215 pounds. Ms. Bettis was sixty-three years old and approximately 5'3" tall and weighed 130 pounds.

subject's wrist to assist officers in controlling an individual or facilitating handcuffing.[8] Officer Bean has neither been taught, nor has it been his experience, that a rear wrist lock exposes anyone, including senior citizens, to serious bodily injury. He did not use OC spray due to the small size of the bedroom, the proximity between Mr. and Ms. Bettis, and the likelihood that the OC spray would have contaminated Ms. Bettis as well as the police officers.

As Officer Bean performed the rear wrist lock by bringing Mr. Bettis's left hand behind his back to handcuff him, he felt Mr. Bettis resist and pull away. At approximately this same time, Officer Bean heard a snap and Mr. Bettis's left arm went limp. Mr. Bettis then exclaimed: "my f****n'—he just broke—he just broke—he just broke my arm[.]" *Id.* at 10:9-10. Mr. Bettis repeated this comment several times. The recording on the 911 call appears to indicate that Ms. Bettis mentioned the word "shoulder" as Mr. Bettis announced that his arm was broken. *See* Doc. 39, Ex. L at 4:30. Ms. Bettis later described the event as follows: "The officer, on his left arm, brought it from the back—or what I tried to tell him was he can't bring it up, because he was bringing it back, I said you can't do that, and it was too late. It was—he'd already—he broke it." (Doc. 32-8 at 23:9-13.)

Officer Bean instructed Mr. Bettis to give him his right hand. He also attempted to handcuff Mr. Bettis's left wrist but was unable to do so. After Sergeant Cochran told him it was unnecessary to proceed further with handcuffing Mr. Bettis, Officer Bean ceased his efforts. Officer Bean directed Mr. Bettis to his knees, and he complied. In

---

[8] Officer Bean describes the rear wrist lock as requiring an officer to use one hand to apply wrist compression to the subject's wrist while the officer's other hand is placed on the inside of the subject's elbow. The compression occurs by bending the subject's hand towards his or her wrist while drawing the subject's arm along the subject's side so that it is even with the subject's hip, then continuing just past the subject's hip and upward to the subject's back. During the maneuver, the subject is likely to feel pain in the metacarpals of the subject's hand, presumably encouraging compliance.

doing so, Officer Bean did not apply pressure to Mr. Bettis's arm and only held Mr.
Bettis's arm in an effort to stabilize it.[9]

Montpelier Fire Lieutenant Dana Houppi arrived at the Bettis residence as Officer
Bean was kicking in the front door. When Lieutenant Houppi entered the residence, he
proceeded to the master bedroom where he saw Mr. Bettis kneeling on the floor and
Officer Bean holding Mr. Bettis's left arm at his side and behind his back. It appeared to
Lieutenant Houppi that Mr. Bettis's arm was being held in an attempt to stabilize it. The
police officers asked Lieutenant Houppi to check Ms. Bettis for injuries. She told him
she was not hurt and she had no visible injuries.

Lieutenant Houppi was familiar with Mr. Bettis, had dealt with him on prior
occasions, including a couple of times within a year of the incident, and had found Mr.
Bettis to be very strong and capable of inflicting injury. Another firefighter/EMT who
responded also had prior experience with Mr. Bettis and found him to be a "big, strong
man." (Doc. 45-1 at 19, ¶ 122.) Based on the amount of resistance he encountered from
Mr. Bettis, Officer Bean also believed he was strong.

As Mr. Bettis was being removed from his residence by the ambulance crew for
treatment, he took hold of one of the attendant's radio straps. The ambulance crew
forcibly removed Mr. Bettis's hand from the strap and restrained him with ties. En route
to Central Vermont Medical Center in Berlin, Vermont, Mr. Bettis attempted to "grab[]
and kick[] rescue person[nel]." (Doc. 39-16 at 2.) Mr. Bettis was transported to the
hospital, where he was admitted for treatment of an elbow fracture. Plaintiffs' expert
witness, Dr. Christian Bean, described Mr. Bettis's behavior as "disinhibited" and he
acknowledged that he appeared "to be actively trying to grab and hurt anyone who he
could get his hands on." (Doc. 45-1 at 20, ¶ 130.)

---

[9] Officer Bean has been trained that officers should direct potentially violent individuals to a
kneeling or prone position whenever possible during an arrest or investigative detention. As part
of that training, he has been taught that the kneeling or prone position enhances safety for the
officer and others who are present because in order for an individual to become an increased
physical threat, he or she must generally attempt to get into a standing position.

### B.    The Criminal Charges against Mr. Bettis.

After the incident, Officer Bean prepared an affidavit of probable cause in support of criminal charges against Mr. Bettis for domestic assault, unlawful restraint, interference with access to emergency services, and resisting arrest.  In the affidavit of probable cause, Officer Bean averred that:

> I grabbed a hold of [Mr. Bettis's] left wrist and pried his hand off of [Ms. Bettis's] arm.  I then performed a rear wrist lock and [brought Mr. Bettis's] left arm behind his back.  I encountered resistance as [Mr. Bettis] tightened and attempted to pull away from my rear wrist lock hold.  I continued to move his left arm behind his back and then heard a snap [after] which I suspect [Mr. Bettis] sustained an injury as he kept repeating "You broke my arm."

(Doc. 38-5 at 1, ¶ 4.)

The Washington County State's Attorney's office subsequently brought charges against Mr. Bettis for unlawful restraint, interference with access to emergency services, and resisting arrest.  On June 29, 2012, the Criminal Division of the Vermont Superior Court, Washington Unit found probable cause for each of these charges.

On July 3, 2012, Mr. Bettis's physician, Peter Redford, M.D., wrote a letter to the Washington County State's Attorney's office, opining that Mr. Bettis could not be held responsible for his behavior and noting that his life expectancy was measured in weeks to months due to unrelated health issues.  On July 5, 2012, after receiving this letter, the State's Attorney's office dismissed the criminal charges against Mr. Bettis without prejudice.  In doing so, the State's Attorney's office advised Officer Bean that if further problems arose the charges could be refiled.

### C.    Mr. Bettis's Death.

Mr. Bettis underwent surgery on June 28, 2012 to "fixate" his elbow by restructuring the joint and holding it together with plates and screws.  (Doc. 39-12 at 11:14-22.)  Mr. Bettis would have received surgery sooner but he was suffering from pneumonia.  The usual cause of the injury he sustained is a direct blow to the elbow, usually from a fall.  The treatment plan was for Mr. Bettis's injured elbow to be in a long-arm cast for two to four weeks.  Generally, the treatment would have been a splint,

8

however, a cast was used because Mr. Bettis's bone quality was compromised due to suspected osteoporosis and because the treating physician had concerns regarding Mr. Bettis's ability to cooperate with postoperative instructions.

An x-ray taken on July 20, 2012 revealed that the fixation in Mr. Bettis's elbow had "completely come apart." *Id.* at 16:12-20. Mr. Bettis's treating physician performed a second surgery on July 23, 2012 to look for infection and to remove the hardware. Initial cultures showed no infection so the majority of the hardware was removed and Mr. Bettis's arm was placed in a splint. Mr. Bettis was briefly transferred to a residential care facility, but returned to Central Vermont Medical Center on July 30, 2012 because the surgical site had become infected. Mr. Bettis was reexamined by his treating physician who advised Mr. Bettis's family that they could elect to have his arm amputated or ask medical personnel to attempt to treat the infection. The Bettis family elected not to pursue further medical intervention. On August 5, 2012, Mr. Bettis died as a result of the infection.

A medical examiner, Dr. Elizabeth Bundock, performed an autopsy on August 6, 2012 and determined that the cause of Mr. Bettis's death was "sepsis due to surgical site infection . . . due to failed fixation of left humerus fracture due to blunt force injury of left arm" and characterized the manner of death as a homicide, stemming from an "altercation with other(s)." (Doc. 32-5 at 2.)[10]

**D.    The Subsequent Investigations.**

Pursuant to the Montpelier Police Department's "Response to Resistance" policy, Officer Bean completed a Montpelier Police Department Use of Force Report. In the report, he stated that he "used [a] rear wrist lock to gain control over [a] male[.] I encountered resistance from [the] male. I brought [his] left arm to the back and heard [a] snap. Male brought to [the] ground." (Doc. 38-4 at 2.)

After Mr. Bettis's death, Montpelier Chief of Police Anthony Facos requested that Captain David Covell of the Vermont State Police ("VSP") conduct an investigation into

---

[10] The medical examiner is required to choose the manner of death from five categories: "natural, accident, suicide, homicide, and undetermined." (Doc. 43-10 at 4:2-5.)

the incident.  Chief Facos also conducted his own review of the incident and concluded that Officer Bean complied with the Montpelier Police Department's policy on "Dealing with Persons of Diminished Capacity."  The policy is intended to "provide field officers with the essential tactical and processing skills necessary to effectively deal with persons of diminished capacit[y]" so as to "protect the community, to safeguard the officers involved in the encounter and to enhance the agency's risk management."  (Doc. 32-12 at 1.)  The policy provides that officers should "limit observable indications of force[,]" use "non-threatening" verbal communication, and avoid "[s]harp, authoritative commands" because "threats to arrest or use force are not productive when dealing with persons with diminished capacities."  *Id.* at 3-4.  The policy further provides:

> Officers should utilize all available tactics to de-escalate the situation where possible, however if an officer is faced with a dynamic and violent situation which poses a threat to the officer or other persons present, then officers should utilize their law enforcement control tactics outlined under the "Response to Resistance" policy to gain control.

*Id.* at 3.

The Montpelier Police Department's Use of Force Policy provides that "[w]hen the use of force is objectively reasonable the degree of force employed should generally be in direct relationship to the amount of resistance employed by the person or the immediate threat the person poses to the officer or others."  (Doc. 32-13 at 1.)  Under the Use of Force Policy, an officer "must weigh the circumstances of each case and employ only that amount of force which is objectively reasonable to control the situation or persons."  *Id.* at 2.

Chief Facos concluded that Officer Bean's actions were justified because he faced a volatile situation that posed a threat to Ms. Bettis.  Chief Facos further concluded that it was appropriate for Officer Bean to apply a rear wrist lock and attempt to handcuff Mr. Bettis.

In the course of the VSP investigation, VSP detectives interviewed Officer Bean, Officer Moulton, and Sergeant Cochran, among others.  Officer Moulton stated in his interview that the dispatcher had "mentioned, you know, possible, you know, mental

health issues or something like that." (Doc. 32-18 at 25:12-14.)  Sergeant Cochran told
VSP detectives that he ordered Officer Bean "to take [Mr. Bettis] down[.]" (Doc. 32-19
at 10:9-10.)  He also advised Officer Bean that "if we cuff [Mr. Bettis], let's cuff him in
the front[.]"  *Id.* at 14:9.

Officer Bean told VSP detectives during his interview that, "[a]t some point, I
don't know which point it was, whether it was—whether it was here, or whether it was
going back with his arm touching his back, I heard a snap." (Doc. 32-16 at 18:8-11.)
Officer Moulton advised VSP detectives that after Mr. Bettis sustained an apparent
injury, "the fight kind of came right out of him[.]" (Doc. 32-18 at 16:18-19.)  The
Vermont Attorney General's Office completed its review of the investigation by the VSP
on November 21, 2012, concluding that there was no evidence of criminal misconduct on
the part of any of the officers involved.

## II.    The Disputed Facts.

Although the parties dispute various facts, their challenges are directed to the
proper characterization of the facts rather than a dispute regarding the facts themselves.
For example, the parties do not dispute that Mr. Bettis was grabbing Ms. Bettis and
causing her pain, even if they dispute whether Ms. Bettis told the 911 operator that she
was in pain or that Mr. Bettis was hurting her.[11]

Similarly, the parties do not dispute that Mr. Bettis was noncompliant with the
officers' orders, but they dispute the extent to which the officers should have been aware
of Mr. Bettis's mental health problems.  The parties agree that Mr. Bettis resisted Officer
Bean's attempt to arrest him but dispute the degree of resistance and whether that
resistance caused Mr. Bettis's arm to break.

The parties offer various arguments regarding the extent to which Ms. Bettis's
comments placed Officer Bean on notice regarding Mr. Bettis's shoulder condition before
Officer Bean applied the rear wrist lock.  They also dispute whether Officer Bean's
attempt to handcuff Mr. Bettis thereafter was a further use of force.

---

[11] The 911 recording appears to be incomplete as it begins when the 911 operator is speaking to a
dispatcher and recounting information provided by Ms. Bettis.

Finally, Plaintiffs argue that Officer Bean has provided inconsistent statements regarding how and when Mr. Bettis's elbow was broken and assert that this is an effort to conceal how the injury occurred.

Mere disagreement as to legal implications of the material facts does not bar summary judgment. *See Beard v. Banks*, 548 U.S. 521, 530 (2006). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

In this case, the court concludes that any disputes over the proper characterization of the facts do not preclude summary judgment. Likewise, it does not matter for purposes of summary judgment whether Mr. Bettis's resistance contributed to his injury or to what location on Mr. Bettis's body Officer Bean had moved Mr. Bettis's arm when he heard it snap.

### III.   Conclusions of Law and Analysis.

####   A.   Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby, Inc.*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* "When both sides have moved for summary judgment,

each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

"Although the burden of demonstrating that no material fact exists lies with the moving party, '[u]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the moving party.'" *Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d Cir. 2008) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

### B.  Qualified Immunity.

The doctrine of qualified immunity protects government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  It applies regardless of whether the alleged harm stems from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

To succeed on this affirmative defense, Officer Bean must establish that his actions did not violate clearly established rights of which an objectively reasonable official would have known. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 134 (2d Cir. 2013) ("Qualified immunity . . . is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment.") (internal quotation marks omitted).  It is undisputed that the right to be free from excessive force is clearly established. *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000); *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). Accordingly, in this case, the only issue is whether the force Officer Bean used was reasonable under the circumstances. *See Cowan ex rel. Estate of Cooper v. Breen*, 352

13

F.3d 756, 764 n.7 (2d Cir. 2003) (observing that in excessive force cases, the qualified immunity inquiry ultimately "converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful.").

### C.   Whether Officer Bean Used Excessive Force.

In order to prevail on a claim brought under 42 U.S.C. § 1983, Plaintiffs must establish (1) actions taken under color of law; (2) a deprivation of a constitutional or statutory right; (3) causation; and (4) damages. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010). In this case, Plaintiffs allege a violation of Mr. Bettis's Fourth Amendment right to be free from an unreasonable seizure. Officer Bean does not dispute that he was acting under color of law, however, all other elements of Plaintiffs' § 1983 claim are contested.

Under the Fourth Amendment, officers are generally permitted to use some degree of force to effect an arrest. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Claims of excessive force that arise in this context are analyzed under a reasonableness standard. *Graham*, 490 U.S. at 395; *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

At the summary judgment stage, once the court has determined the relevant undisputed facts and drawn all appropriate inferences, the court's determination of reasonableness is a question of law. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). The court's inquiry must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The determination "requires careful

14

attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The court may also consider "whether there were exigent circumstances, whether the use of less force was feasible and prudent, and whether the officer took reasonable steps to minimize the use of force and any injury resulting from that force." *MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *5 (D. Vt. May 25, 2012), *aff'd*, 548 F. App'x 6 (2d Cir. 2013).

### 1.    Mr. Bettis's Fourth Amendment Rights.

It is undisputed that Mr. Bettis had a Fourth Amendment right to be free from an unreasonable seizure accomplished through the use of excessive force. It is further undisputed that the injury he sustained as a result of the incident was a serious one. In determining whether Officer Bean used excessive force, the court must therefore start from the proposition that the Fourth Amendment interests at stake were substantial.

### 2.    The Crimes at Issue and the Governmental Interests at Stake.

The court next examines the crimes at issue and the magnitude of the governmental interests at stake. In this case, Officer Bean was responding to a 911 call reporting a domestic disturbance with unknown weapons, a victim who was no longer on the 911 call, and the perpetrator experiencing a potential seizure or mental health crisis. As Officer Bean approached the Bettis residence, he heard yelling from within and made a lawful warrantless entry in response. *See Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (holding "[p]olice officers may enter a dwelling without a warrant to render . . . assistance to a person whom they reasonably believe to be in distress").

As the first officer to enter the master bedroom, Officer Bean was confronted with an agitated individual holding his wife apparently against her will and yelling at her at close range. Ms. Bettis appeared to be in pain and was upset and crying. Mr. Bettis, who was much taller and heavier than his wife, was in striking distance of her and appeared to believe he had been the victim of her abuse. Officer Bean attempted to secure Ms. Bettis's release through verbal commands, but this proved unsuccessful. Thereafter,

Officer Bean and Officer Moulton pried Mr. Bettis's hands from Ms. Bettis's wrists and attempted to take him into custody. Mr. Bettis resisted those efforts. At that point, Mr. Bettis posed an immediate threat to both Ms. Bettis and the responding officers.[12] The threat of harm to Ms. Bettis and the responding officers was arguably compounded by their concern that a mental health condition or a seizure was causing Mr. Bettis's erratic behavior because it rendered it more difficult to predict how Mr. Bettis would respond to police intervention. *See Tierney*, 133 F.3d at 196-97 (noting a court must consider "the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences"); *see also Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (observing that "police officers are often forced to make spot judgments about a person's mental health and should be entitled to reasonable leeway in those situations.").

In addition to responding to a volatile and escalating domestic disturbance, the responding officers were also investigating a potential crime. When Officer Bean encountered Mr. Bettis, he was holding Ms. Bettis and would not release her when commanded to do so. The officers were aware that Ms. Bettis had placed a 911 call that she did not complete. Mr. Bettis was ultimately charged with and probable cause was found for the crimes of unlawful restraint, interference with access to emergency services, and resisting arrest. Although misdemeanors, each of these crimes had the potential to result in bodily injury to either the victim or law enforcement, or both.

---

[12] Courts recognize that domestic disputes not only place the physical safety of victims at risk, but also often threaten the physical safety of responding officers. *See Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) ("'The volatility of situations involving domestic violence' makes them particularly dangerous.") (internal alteration omitted) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)). Consequently, "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (quoting *Martinez*, 406 F.3d at 1164).

Officer Bean also had at least arguable probable cause to arrest Mr. Bettis for domestic assault.[13] He had witnessed Mr. Bettis apparently causing his wife pain by grabbing and restraining her wrists and was aware of the possibility of a fight. The fact that Mr. Bettis was not ultimately charged with domestic assault is of no consequence. *See Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) ("[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful."). Because the safety of the victim, the perpetrator, and the responding officers was threatened, and because Officer Bean was investigating a number of offenses including an assault, the governmental interests at stake were significant and the crimes at issue were serious.

### 3.     The Degree of Force Used and Lesser Alternatives.

Finally, the court considers whether the degree of force used by Officer Bean was reasonable under the circumstances and whether a lesser degree of force was feasible. *See Graham*, 490 U.S. at 395 (explaining that "the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out."); *see also Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) (holding that where the subject is resisting arrest, the force used "must be reasonably related to the nature of the resistance"); *Brayshaw*, 2015 WL 1523019, at *12 (noting that a court deciding whether force was excessive should consider whether "lesser measures could have accomplished the same objective."). There is, however, no requirement that an officer use the least amount of force necessary. *See Bryan v. MacPherson*, 630 F.3d 805, 818 (9th Cir. 2010) (holding "an officer need not have perfect judgment, nor must he resort only to the least amount of force necessary to accomplish legitimate law enforcement objectives.").

---

[13] Under Vermont law, "[a]ny person who attempts to cause or wilfully or recklessly causes bodily injury to a family or household member, or *wilfully causes a family or household member to fear imminent serious bodily injury* shall be imprisoned not more than 18 months or fined not more than $5,000.00, or both." 13 V.S.A. § 1042 (emphasis supplied). Household members include "persons who, for any period of time, are living or have lived together, are sharing or have shared occupancy of a dwelling, are engaged in or have engaged in a sexual relationship, or minors or adults who are dating or who have dated." 15 V.S.A. § 1101(2); *see also* 13 V.S.A. § 1041 (defining household member by referencing the definition in Title 15). Domestic assault is a misdemeanor under Vermont law.

Rather, available alternatives are relevant because excessive force may sometimes be found where the force used was clearly excessive to accomplish the task at hand. *See, e.g., Weather v. City of Mount Vernon*, 474 F. App'x 821, 823-24 (2d Cir. 2012) (upholding jury verdict finding excessive force where plaintiff "was breaking no law, was not resisting arrest, and was not placing himself or others in danger" and defendant officer "twisted plaintiff['s] arm behind plaintiff's back" and "shove[d] or push[ed] plaintiff forcefully into the brick wall").

Plaintiffs concede that the officers were justified in using force to remove Mr. Bettis's hands from Ms. Bettis's wrists. They argue, however, that once Mr. Bettis was separated from Ms. Bettis, Officer Bean's use of further force was unnecessary and excessive. Plaintiffs challenge both Officer Bean's use of a rear wrist lock to restrain Mr. Bettis and his attempts to handcuff him thereafter. Officer Bean counters that he used a minimal degree of force against a noncompliant individual who was actively resisting efforts to take him into custody and that other forms of force were either more aggressive or not reasonably available.

The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. In addition, courts recognize that the refusal to comply with lawful police commands may, itself, render the use of force reasonable to achieve compliance. *See Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 128 (2d Cir. 2009) (holding officer's use of force was reasonable where suspect ignored command to stay still and refused to allow officer to apply handcuffs).[14]

---

[14] Failure to comply with a lawful police order can constitute a "serious infraction," *Hayes v. City of Seat Pleasant*, 2010 WL 3703291, at *7 (D. Md. Sept. 16, 2010), and may justify not only a show of force but the use of force. *See Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (determining it was reasonable for law enforcement to use force where the suspect had already disobeyed one direct order from law enforcement); *Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (stating law enforcement officers' use of force was not excessive where officers "were faced with a group that refused to obey the officers' commands").

In this case, when the officers made their way to the master bedroom and discovered Mr. Bettis unarmed, they immediately holstered their firearms which was an appropriate de-escalation of force. Mr. Bettis, however, remained noncompliant with Officer Bean's verbal order to release his wife. After Officer Bean and Officer Moulton forcibly removed Mr. Bettis's hands from his wife's wrists, he remained noncompliant, agitated, and difficult to subdue. Plaintiffs' suggestion that Officer Bean should have used OC spray on Mr. Bettis would have escalated the use of force and would have contaminated everyone in the bedroom. *See Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (holding use of pepper spray "constitutes a significant degree of force" and should not be used "lightly or gratuitously").

Although the responding officers soon became aware that Mr. Bettis's mental capacity was impaired, they had no means of discerning whether Mr. Bettis was likely to be violent.[15] Mr. Bettis was a large man who appeared strong and capable of inflicting injury and he was not wearing a sling, cast, bandage, or other indicia that he was suffering from any kind of pre-existing injury. He was swearing, repeatedly stating that he was not taking any more abuse, and he appeared both angry and upset. The fact that Mr. Bettis was surrounded by law enforcement did not necessarily render the situation less volatile. *See Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("[W]e note that at least one other court has rejected the idea that a surrounded suspect presents no danger to others") (citing *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)).

While authoritative commands may not have been the preferred approach to subduing a person of diminished capacity, Officer Bean's request that Mr. Bettis get down on the ground so that he posed less of a threat was a reasonable response under the

---

[15] Plaintiffs fault the responding officers for not consulting with the EMTs at the scene (who had dealt with Mr. Bettis on prior occasions). Not only did there appear to be exigent circumstances that rendered an immediate entry into the Bettis residence advisable, it is far from clear that a consultation would have altered the police officers' response. Despite their prior experience with Mr. Bettis, the EMTs also had to physically restrain him to prevent him from hurting others.

circumstances.[16]  When Mr. Bettis failed to comply with this command, Officer Bean reasonably decided to attempt to take him into custody.  *See Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (holding deputy's use of a taser gun to effect arrest of motorist stopped for an unilluminated registration tag did not constitute excessive force as motorist was noncompliant with requests to retrieve certain relevant documents and was "acting belligerently and confrontationally" and thus deputy's use of force was a reasonable response to a "tense and difficult" situation).

Thereafter, Officer Bean attempted to use a rear wrist lock to gain compliance of Mr. Bettis's hands to facilitate handcuffing.  Although Plaintiffs are correct that the Second Circuit has held "handcuffing [is] not *per se* reasonable" to effect an arrest, it has also held that "[n]either the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if he does not resist or attempt to flee." *Soares v. Connecticut*, 8 F.3d 917, 921-22 (2d Cir. 1993).  Moreover, notwithstanding "a general consensus among courts to have addressed the issue that otherwise reasonable force used in handcuffing a suspect may be unreasonable when used against a suspect whom the officer knows to be injured," the Second Circuit has observed that it is "aware of no case . . . where a court held that ignoring an *un*cooperative suspect's claim of *invisible* injury (such that handcuffing could

---

[16] Plaintiffs argue that Officer Bean violated the Montpelier Police Department's policy for Dealing with Persons of Diminished Capacity.  A violation of policy, however, does not automatically render an officer's conduct unreasonable or give rise to a constitutional violation. *See Soares v. Connecticut*, 8 F.3d 917, 922 (2d Cir. 1993) ("We further note that the district court placed unwarranted reliance on whether the officers complied with a written . . . handcuffing policy.  To be sure the written policy might bear upon whether the officers' actions were objectively reasonable, but it has no bearing on whether the officers violated clearly established constitutional or statutory rights unless it somehow created a protected interest in the plaintiff in not being handcuffed"); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) ("Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force.  A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983.  To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense.").

be harmful) made during the course of handcuffing constituted excessive force." *Beckles v. City of New York*, 492 F. App'x 181, 182-83 (2d Cir. 2012).

Here, Officer Bean had no prior notice that Mr. Bettis was injured or was otherwise more susceptible to injury than the average arrestee, and by her own admission Ms. Bettis's warning about Mr. Bettis's shoulder consisted of a brief warning that came too late. *Cf. Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998) (permitting excessive force claim where, despite visible shoulder injury marked by use of a sling, officer grabbed plaintiff's wrist, pushed him, and held him against a door). No rational jury could conclude that Officer Bean performed the rear wrist lock with an intent to cause Mr. Bettis injury or with knowledge that it was likely to cause Mr. Bettis injury. *See Sheridan v. Trickey*, 2010 WL 5812678, at *9 (D. Or. Dec. 16, 2010), *report and recommendation adopted*, 2011 WL 588769 (D. Or. Feb. 10, 2011) ("Furthermore, [the officer] made an honest mistake of fact when he concluded that a takedown could be executed under the circumstances in a manner that minimized harm to [the plaintiff]; there is no evidence that suggests [the officer] acted to deliberately harm [the plaintiff] or that he executed the takedown knowing that [the plaintiff] likely would be hurt.").

The rear wrist lock is a minimal use of force that generally does not pose a significant risk of injury.[17]  Officer Bean's training indicated that it was not likely to cause injury and was appropriate for use on senior citizens. Although Plaintiffs argue that it is relevant whether Officer Bean heard Mr. Bettis's arm snap when Mr. Bettis's arm was near his side or near his back, any dispute in this respect is immaterial as there

---

[17] *See, e.g., Fuller v. Cty. of Orange*, 276 F. App'x 675, 680 (9th Cir. 2008) ("[P]lacing [the plaintiff] in a rear wristlock did not constitute an unreasonable use of force."); *Lee v. Hefner*, 136 F. App'x 807, 813 (6th Cir. 2005) ("Plaintiffs' own expert . . . conceded that the wrist lock is 'a low level of force with minimal probability of injury.'"); *Wilson v. Stallard*, 2010 WL 3291798, at *8 (W.D. Va. Aug. 19, 2010), *aff'd*, 403 F. App'x 797 (4th Cir. 2010) ("[T]he *de minimis* nature of the injury inflicted on [the plaintiff's] wrist by [the officer's] use of the wrist lock indicates that this use of force was also *de minimis*."); *Johnson v. Nwankwo*, 2004 WL 1660375, at *1 (N.D. Tex. July 23, 2004) ("[The plaintiff] was subdued and restrained with a wrist-lock, which was the minimum amount of force necessary to ensure [the plaintiff's] compliance and to prevent any further attack on any Officer."); *Bermudez v. Kelly*, 1998 WL 798893, at *3 (N.D. Cal. Nov. 9, 1998) ("[T]he force used by these officers was minimal, placing plaintiff in wrist locks, taking him to the ground, and holding him against the patrol car.").

can be no reasonable claim that Officer Bean briefly continued the maneuver in order to exacerbate Mr. Bettis's injury. Officer Bean was not required to perform the maneuver perfectly and it was objectively reasonable for him to apply more force in the face of Mr. Bettis's perceived resistance. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."). Correspondingly, the fact that Mr. Bettis suffered a serious injury in the course of the rear wrist lock does not render Officer Bean's conduct unreasonable or his use of force excessive. "[T]he Fourth Amendment addresses 'misuses of power,' not the accidental effects of otherwise lawful government conduct." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (internal citation omitted); *see also Brayshaw*, 2015 WL 1523019, at *11 (noting that "officers do not use excessive force where they make an objectively reasonable mistake of fact regarding the amount of force required or their ability to employ a . . . maneuver in a manner that minimizes harm to the suspect"). Officer Bean's use of the rear wrist lock was thus a reasonable means of obtaining control of an agitated and noncompliant individual whom he had probable cause to arrest and who appeared to pose an immediate threat to those in close proximity to him.

Plaintiffs' argument that once Mr. Bettis had suffered an injury it was unreasonable to attempt to handcuff him is equally unpersuasive. After Mr. Bettis stated that his arm was broken and it appeared limp, Officer Bean tried to secure a handcuff on him. There is no evidence that this effort caused Mr. Bettis additional pain or additional injury. As soon as Sergeant Cochran advised that handcuffing was not necessary, Officer Bean ceased his efforts. No more than a few minutes had elapsed in the interim, and Mr. Bettis was ultimately not handcuffed. *See Graham*, 490 U.S. at 397 (observing that officers are required to make "split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving"). The fact that Mr. Bettis had to be restrained with ties as he was transported to the hospital for treatment underscores the conclusion that it was objectively reasonable for Officer Bean to believe that Mr. Bettis's injury did not render

him incapable of further physical aggression. *See Kerman*, 261 F.3d at 239 (noting that "[q]ualified immunity . . . protects officers from the sometimes 'hazy border between excessive and acceptable force.'") (citation omitted).

On balance, the governmental interests at stake outweighed Mr. Bettis's interest in being free from handcuffs in a situation where he was noncompliant with verbal commands, physically and verbally aggressive, and at least appeared to be resisting an arrest supported by probable cause. The minimal force used by Officer Bean was therefore reasonable in the circumstances. Because the court has concluded that Officer Bean did not violate Mr. Bettis's Fourth Amendment rights by using excessive force, Plaintiffs have failed to establish an essential element of their § 1983 claim. The court therefore DENIES Plaintiffs' partial motion for summary judgment on the issue of excessive force and GRANTS Officer Bean's cross motion for summary judgment on this same issue.

As the court has found no constitutional violation, it need not proceed further with its qualified immunity inquiry. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("Courts have discretion to decide the order in which to engage these two prongs" of the qualified immunity analysis); *see also O'Brien v. Barrows*, 2013 WL 486655, at *5 (D. Vt. Feb. 7, 2013) ("Answering either prong in the negative will bar suit against the official") (citing *Pearson*, 555 U.S. at 232). The court nonetheless notes that "there is still no clear authority on whether and under what circumstances, if any, a person has a constitutional right not to be handcuffed in the course of an arrest . . . even if he does not resist or attempt to flee." *Soares*, 8 F.3d at 922. Plaintiffs would thus face an uphill battle in arguing that any reasonable officer would know that Officer Bean's conduct in this case violated the Constitution. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding that a right is "clearly established" only if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right"); *see also Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established."). "As the qualified immunity defense has evolved,

it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Here, even had the court found excessive force, qualified immunity would have been available because the right not to be handcuffed in the circumstances of this case was not clearly established.

**CONCLUSION**

For the reasons set forth above, the court DENIES Plaintiffs' motion for partial summary judgment (Doc. 32) and GRANTS Officer Bean's cross motion for summary judgment (Doc. 39).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29th day of September, 2015.

Christina Reiss, Chief Judge
United States District Court